## ARGUED AND DETERMINED

IN THE

# COURT OF COMMON PLEAS,

FOR THE

## CITY AND COUNTY OF NEW YORK.

HEGEMAN & CO. *against* JOHNSTON N. HEGEMAN *et al.*

JOHNSTON N. HEGEMAN *against* HENRY T. CUTTER *et al.*

[SPECIAL TERM.]

(Decided February 14th, 1880.)

A person may acquire the right known as the good will in a business, from its being established in a particular place, from which he has derived, or may derive, profit, and when there is attached to the business a name indicating to the public where or in what manner it is carried on, and it is a right which will be protected by a court of equity, even when he removes the business to another place.

The proprietary right which a man has acquired in a trade-mark, or in the use of his name, or in any name general or otherwise which designates a particular business established and carried on by him, involving what is known as the "good will" of the business, is in the nature of property, and transmissible by assignment or bequest, and will pass with the sale of the business to which the name or trade-mark is attached, or under a general assignment for the benefit of creditors, which, by its terms, transfers all the insolvent's property for the pay-

Hegeman & Co. v. Hegeman.

ment of his debts, although it may not be specified in the schedule annexed to the assignment, or in the one which, under the General Assignment Act of this State, is subsequently made out and filed.

In 1827, one William L. Rushton established, in the city of New York, a business in the sale, by wholesale and retail, of drugs and medicines, with which was connected the putting up of medical prescriptions, and of special preparations known by names of his own creation or adoption. In 1832 he associated with him one Aspinwall, and in 1843 William Hegeman, who had originally been in Rushton's employment, became a partner in the place of Aspinwall, and continued thereafter to be a partner during several changes of proprietorship and of the firm name, until he became the principal proprietor, when the firm name was changed to that of Hegeman & Co. The firm then had a central or principal place of business at No. 203 Broadway, and branches in other parts of the city. William Hegeman afterwards associated with him his son, J. N. Hegeman, and the business, as conducted by them under the firm name of Hegeman & Co., had a high reputation, which was largely due to the experience, knowledge and business-like qualities of William Hegeman. The special preparations compounded and sold by the firm were made up by assistants employed in the pharmaceutical department from formulas or recipes which William Hegeman gave them, and which were copied out from a book which he kept in his possession. These special preparations were distinguished by special names with which that of Hegeman was incorporated, such as "Hegeman's Compound Fluid Extract of Buchu," and the label attached to them had on it a symbol or emblematic trade-mark, which represented the figure of an eagle, with extended wings, perched upon a mortar and pestle, with a scroll from the eagle's mouth, containing the words "established 1821," which was accompanied by a statement on the label that the article was prepared only by Hegeman & Co. After the death of William Hegeman, the surviving partner made a general assignment for the benefit of creditors—conveying to the assignee the entire copartnership property and effects in general and comprehensive terms, such as "all choses in action," and "all property and effects, of every nature and description, of whatever name or nature," and the assignee thereunder sold to a purchaser, who paid a substantial consideration therefor, the trade-mark and good will, and as connected with it the business name, and "all preparations, recipes, formulas, prescriptions, and recipe books, labels, plates, proprietary rights, and proprietary articles." After this sale the surviving partner, J. N. Hegeman, associated with himself one J. W. F., and under the name of Hegeman & Co. opened a store at 756 Broadway, and sold the special preparations of the old firm of Hegeman & Co. under the same names and labels that it had done :—*Held*, that the good will of the business, and the right to claim to be the successor of the firm of Hegeman & Co. passed to the purchaser from the assignee, and that J. N. Hegeman, as surviving partner of that firm, had no right growing out of his former connection with the partnership to assume or hold out to the public, and to the detriment of those who acquired by purchase all that remained of the former firm, that he was carrying on the same firm and business, or to vend the special preparations of that firm so labelled and marked as to indicate to purchasers

that they were put up and prepared by that firm, and that he had no right to the business name, the trade-mark, or to anything incident or belonging to the firm, except the use of his own name, of which he could not be divested, and the right to attach his own name to the articles he manufactured and owned, but not in such a way as to pass them off as the articles manufactured or prepared by the firm of Hegeman & Co., or by those who had succeeded to that firm, and also the right to enjoy whatever benefit or advantage he might derive by representing that the business carried on at 756 Broadway was carried on by a firm, one of whose partners was formerly a member of the firm of Hegeman & Co.

The purchaser from the assignee of Hegeman & Co. of the trade-mark, good will, &c., sold all the rights acquired by such purchase to a corporation (which had been formed under the general act of 1848, for the formation of corporations for manufacturing, &c., purposes) whose corporate name was "Hegeman & Co.," and this corporation advertised its business under the style of "Hegeman & Co., Chemists and Druggists, 203 Broadway only, New York," and issued a circular stating that the concern of Hegeman & Co. had resumed business, and generally conducted the business—in their dealings with the general public—as if it were not a corporation, but a continuation of the old firm :—*Held*, that the purchase from the assignee, in view of the statutes of this State (L. 1833, c. 281), against doing business in fictitious names, did not confer on the purchaser the right to do business under the name of Hegeman & Co., but only as the successor of that firm, and that the manner in which the corporation was doing business was an attempt to evade the statute, and a fraud on the public, and that as long as it continued so to do a court of equity would not enforce against infringers thereof its rights to the good will and trade-mark of the old firm of Hegeman & Co.

TRIAL at special term.

The facts are stated in the opinion.

*Horatio F. Averill*, for Hegeman & Co.

*William H. Ingersoll*, for Johnston N. Hegeman and others.

CHARLES P. DALY, Chief Justice.—These cases, which are cross-actions relating to the same thing or right, involve an examination of several questions as to the right of property in a name, in a trade-mark, in a name and trade-mark so united, that they, together, form the trade-mark, and in the good will of an established business, indicated by a general name, or the name of the proprietor, or of a former proprietor or founder.

It will be necessary, first, to state the law, so far as it has

been settled in respect to property in a name, in a trade-mark, and in the good will of an established business, and what is incident to it, before applying the law to the facts in this case.

When, however, the whole pecuniary value of a name in its connection with an article of merchandise, or a manufacture, or a business, is derived solely from the personal qualities of the one to whom the name belongs, such as his skill, special knowledge and experience, or from the fact that the article is produced under his personal supervision, which imparts to it a special value, then the right to the name is not transmissible.

A trade-mark may consist in a name, or in a symbol or device used to indicate the nature, quality or identity of an article of commerce, whether it consists of an article that any one is at liberty to fabricate, compound or vend, or which originated with, or the exclusive right to manufacture or vend which is under the protection of a patent, or otherwise in the person or proprietor by whom the trade-mark was devised. It may exist where the name of the article and of the proprietor are so blended together that the right to the use of the name is indispensable to the use of the trade-mark, or may consist of the name alone of the manufacturer or proprietor, or may exist where the article fabricated is so made or shaped that the peculiar form of it is designed to, and does, serve as a trade-mark; as in the case of a sewing-machine, the iron framework of which was so constructed as to represent and form the two initial letters of the proprietor's name.

A person may acquire the right known as the good will in a business from its being established in a particular place, from which he has derived, or may derive, profit, and where there is attached to the business a name indicating to the public where, or in what manner, it is carried on ; and this is a right which will be protected in a court of equity, even where he removes the business to another place. (*The G. & H. Mnfg. Co.* v. *Hall,* 61 N. Y. 232; *Harper* v. *Pearson,* 3 Law Times, [N. S.] 547 ; *Howard* v. *Henriques,* 3 Sandf.

725; *Christy* v. *Murphy*, 12 How. Pr. 77.)   The proprietary interest which a person has in his name, so far as any pecuniary value arises from the use of it, which a court of equity would protect, or which may be transmissible by assignment, is necessarily connected with some business, trade-mark, or other interest, through which a pecuniary value has become attached to it.

The proprietary right which a man has acquired in a trade-mark, or in the use of his name, or in any name, general or otherwise, which designates a particular business established and carried on by him, involving what has been previously described as the good will of the business, is, being in the nature of property, transmissible by assignment or bequest (*The G. & H. Mnfg. Co.* v. *Hall*, 61 N. Y. 227, 230, 231; *The Leather Cloth Co.* v. *American Leather C. Co.*, 4 De Gex, J. & Sp. 142; id. H. of L. Rep. 522; 11 Jurist, [N. S.] 513; *Sargent* v. *Romen*, Annales de la Prop., t. 13, p. 21; *Congress, &c., Co.* v. *High Rock, &c.*, 57 Barb. 526; id. 45 N. Y. 291; *Dixon Crucible Co.* v. *Guggenheim*, 3 Am. Law Times R. [St.] 288; *Lockwood* v. *Bostwick*, 2 Daly, 521; *Hitchcock* v. *Cohen*, 6 Ad. & Ell. 438, 449; *Howe* v. *Searing*, 6 Bosw. 354; *Clinton* v. *Douglas*, 1 H. R. V., Johnson, 176; *Ainsworth* v. *Walmesley*, 44 L. J. R. 242; *Durreya* v. *Plato*, 29 Cal. 292; *Hall* v. *Barrows*, 10 Jur. [N. S.] 55; 4 De Gex, J. & S. 156, 157, 158; *Croft* v. *Day*, 7 Beav. 84; *Bradbury* v. *Dickens*, 27 id. 53; *McLean* v. *Fleming*, 6 Otto, 249, 250; Browne on Trade-marks, §§ 359, 360), and will pass with the sale of the business to which the name or trade-mark is attached; or under a general assignment for the benefit of the creditors, which, by its terms, transfers all the insolvent's property for the payment of his debts, although it may not be specified in the schedule annexed to the assignment, or which, under our statute, is subsequently made out and filed.   (*Hall* v. *Barrows, supra ; Burns* v. *Bedford*, 33 Law J. [N. S.] 465; *Edilsten* v. *Vick*, 11 Hare, 78; *Hudson* v. *Osborne*, 39 L. J. Ch. [N. S.] 79; *Couch* v. *Delaplaine*, 2 N. Y. 397; *Platt* v. *Lott*, 17 id. 478; *Cram* v. *Union Bank*, 1 Abb. Ct. of App. Dec. 461; *Miller* v. *Halsey*, 4

Abb. Pr. [N. S.] 33.) When, however, the whole pecuniary value of the name, in its connection with an article of merchandise, or a manufacture, or a business, is derived solely from the personal qualities of the one to whom the name belongs, such as his skill, special knowledge and experience, or from the fact that the article is produced under his personal supervision, which imparts to it an especial value; then the right to the name is not transmissible. It is then purely personal ; and this is equally so with a trade-mark used and recognised, as denoting that the article or product is made by a particular person, whose skill, experience, or other personal quality, or whose personal experience in the fabricating, preparation or production of it, gives to it a peculiar value, which is distinguishable from a trade-mark used as a brand of quality, or of texture, fineness, or other characteristics ; or to indicate that it is made in a particular establishment or manufactory ; or where a name simply denotes an established business, with whatever advantages may accrue from its long establishment, the fact that it is generally or widely known, and the confidence it inspires from its duration. (*Hall* v. *Barrows*, *supra; Bury* v. *Bedford*, *supra; Carmichael* v. *Lattimer*, 11 R. I. 395.)

The defendant, while conceding that a party can dispose of the right to use his name in a certain business, insists that it will not pass under a general assignment for the benefit of creditors, but only by a clearly expressed intention on his part to do so, in the form of a positive agreement; and in support of this refers to many cases, three only of which I deem it necessary to notice and distinguish, as the residue have no bearing whatever upon the point raised.

In *Bradley* v. *Norton* (33 Conn. 157), where the adopter of the trade-mark, which contained his own name as part of the title of a new compound prepared and sold by him as a fertilizer, made an assignment for the benefit of creditors, but the trade-mark was not inventoried by the trustee or by the appraiser, and was never claimed by the trustee or by the creditors, nor in any manner disposed of under the assignment; and where the adopter, upon getting again into

business, prepared and sold the same compound by the same name, it was held by McCurdy, J., as against an infringer of the trade-mark, that the assignment had been "incomplete and inoperative in respect to this right," and that the defendant could not set up the effect of the assignment to screen himself from his illegal proceeding. This case is distinguishable from the one now before me, in the fact that the business name, good will and trade-mark were, in the present case, claimed and sold by the assignee for a considerable sum of money, which went to the creditors under the assignment; and it is by virtue of that sale that the legal right to it is claimed in this action. The decision of the court upon this point in *Bradley* v. *Norton* was correct; but not for the reason assigned by Judge McCurdy, that the assignment did not operate to transfer it. The facts stated show that the right to it, under the assignment, was abandoned. A trade-mark, whether it consists of a symbol or a descriptive name, may be abandoned; and if it is, it may then be appropriated by any one, who, by doing so, adopts it as his own; or after it is abandoned it may be resumed by the original proprietor and readopted by him, if, in the mean time, it has not been taken possession of by another, or by the community in general, or become, as a name or device, by general user, a mere designation of the kind of article or product, when its quality as an exclusive trade-mark is gone; the criterion or test being, was there an *intention* to abandon, which will depend upon the special circumstances of the particular case. (*Dental Vulcanite Co.* v. *Weatherbee*, 3 Fish, 87; *Lemoine* v. *Gauton*, 2 E. D. Smith, 243; Browne on Trade-marks, §§ 677, 680, 681, 691.) In *this* case of *Bradley* v. *Norton*, the intention to abandon was manifest. Neither the trustee, the creditors, nor any one under the assignment having assumed any right to the use or disposition of it, it was abandoned, and the insolvent, upon again going into that business, had the right to readopt it as he did.

In *Helmbold* v. *Helmbold* (53 How. Pr. 457), Westbrook, J., after stating that a party could, by a voluntary sale or

assignment, transfer the right to use his knowledge and name, remarked that he did not "see how the right to use his own knowledge or name could be taken from him by any judicial proceeding whatever; that, if they can be, the merchant who has become unfortunate, but who has still a knowledge and a name with which to begin business anew, must, if he has been adjudged a bankrupt, be content to leave with his assets, his brains and his character." In these remarks the judge recognises that, by a voluntary assignment for the benefit of creditors, the right to use a man's name could be assigned; and beyond this, he merely distinguishes what I have already pointed out, that when a man's personal qualities are what constitutes the value in the use of his name, they are not, in their nature, assignable.

*Moir* v. *Brown* (14 Barb. 39) merely decides that nothing is transferable by assignment for the benefit of creditors, where the general words of the instrument refer to the schedule annexed as showing what is assigned, and the schedule was not annexed at the time of the delivery of the instrument. In *Corwin* v. *Daly* (7 Bosw. 222), it was simply decided that a man could acquire no right to appropriate exclusively to himself such general words as "Club House Gin," as a trade-mark, and consequently could not, by assignment, transfer to another what he did not possess himself, and the remaining cases referred to are equally inapplicable.

The cases I have cited establish, in my judgment, that a trade-mark and the name by which a business has become known, involving what is understood by the good will, will pass under a voluntary assignment, transferring the insolvent's property of every nature and kind for the payment of his debts, unless the value of the name has arisen from, and depends solely upon, the personal qualities or personal supervision of the one to whom it belongs. In none of the cases cited by the counsel of J. Niven Hegeman has it been decided that it will not; nor do they, in my opinion, afford any countenance for so holding. The whole point is pithily

put in one of the cases I have cited (*Hudson* v. *Osborne*, 39 L. J. Ch. 79 ; 21 L. J. [N. S.] 386) in the statement that, in substance, there is no distinction between the sale by a man of his business good will and trade-mark and the sale of them by an assignee in bankruptcy of all the bankrupt's assets of every kind, and the insolvent has no right afterwards to use the trade-marks which were the marks of that business, or to use the name or title of the firm as representing himself as continuing the business, all the rights of which passed to his assignee, and to the purchaser, under the assignment. He has no right to represent himself as continuing the identical business that was sold by his assignee to another, which does not, however, debar him from going into the same business again, and indicating the fact of his having been in the former one, or from alleging anything respecting the new business, unless it be done with a design to impair the right of the purchaser of the former business, or to mislead the public, as has been held in *Cruttwell* v. *Lye* (17 Ves. 346) and *Clinton* v. *Douglass* (1 H. R. V. Johns. R. 176).

It has been decided in several cases, that where a man has introduced a new medical preparation and given it a title, a component part of which is his own name, as indicative of the true origin and ownership of the article, and not used simply to designate the article itself, and assigns to another all his interest in it, with the sole right thereafter to manufacture and vend it, the transfer carries with it the right to use the name by which it has become known. But where the name is not used as solely indicative of origin and ownership, but of the ingredients, characteristics, composition or qualities of the preparation, as " Ferro-Phosphated Elixir of Calisaya Bark " (*Caswell* v. *Davis*, 58 N. Y. 223) ; or " Cherry Pectoral " (*Ayer* v. *Rushton*, 7 Daly, 9) ; or where the term employed is one that has acquired a generic meaning, as descriptive of a general kind, quality, or class of medicines; as where the name employed is " James' Powders," " Turlington's Balsam " or " Thompsonian Medicines," a party has no exclusive right or privilege to compound and

vend such medicine, although he may have been the first to devise the compound, or although his own name forms a part of the title he has given to it. (*Thompson* v. *Winchester*, 19 Pick. 214; *Caswell* v. *Davis*, 58 N. Y. 223; *Ayer* v. *Rushton*, 7 Daly, 9; *Amoskeag Manufact'g Co.* v. *Spear*, 2 Sandf. S. C. 610; *Fetridge* v. *Wells*, 4 Abb. Pr. 146.) But, although no exclusive right to use a name of this description can be acquired, and any one is at liberty to use it, another is not allowed so to use it as to injure the proprietor and deceive the public by so printing the name and so arranging the form, color, appearance, and inscription, upon the package or label, as to convey the impression that his commodity was made or put up by the other proprietor, which is a fraud and an imposition, and he would be enjoined by a court of equity from doing it. (*McHarg* v. *Eastman*, 35 How. Pr. 205; *Lockwood* v. *Bostwick*, 2 Daly, 521; *Enoch Morgan's Sons' Co.* v. *Schnachofer*, 55 How. Pr. 37.) It has also been held, in several cases, that where a trade-mark or a name, or a trade-mark and name united, has been used and recognised, as denoting that the article is made at a particular establishment, the name used being that of the proprietor of the establishment, as "Stilman's Mill" (*Carmichael* v. *Latimer*, 11 R. I. 409), that those who succeed to the establishment, such as his heirs, next of kin, or his successors in interest, may, in carrying on the establishment thereafter, there being no statutory enactment to the contrary, continue to use the same name and trade-mark, without any reference to their derivative title, for nobody is thereby deceived, as they get the same article and from the same place that they got it before. (*Whitehouse* v. *Brown*, 44 Md. 303; *Fulton* v. *Sellers*, 4 Brews. 22; *The Leather Cloth Co.* v. *The Am. Leather Co.*, 11 H. of L. 542; *Carmichael* v. *Latimer*, 11 R. I. 409; *Filkins* v. *Blackman*, 13 Blatch. 444.) But it has been held, that if the assignee, who has acquired the right to manufacture an article which was manufactured at a particular place, manufactures it at another place, but continues to use the former trade-mark, which states where the article was manufactured, and that it had certain quali-

ties, some of which the assignee omitted in his manufacture of it, that no right existed in such a case to use the former trade-mark, for the reason that what was upon it was then untrue. (*Leather Cloth Co.* v. *The Am. Cloth'g Co.*, *supra*.)

It is, in certain cases, difficult to determine whether the whole or principal value of a trade-mark or name arose from, and depended upon, the personal qualities or personal supervision of the one who adopted it. It has been recognised in some of the cases that banking houses like Baring Brothers, of London, that have a name that has become valuable, do, and may rightfully continue the house under the original name, although no person of that name remains in the firm. (*The G. & H. Manuf. Co.* v. *Hall*, 61 N. Y. 232.) The value of the name in such a case naturally grows out of the long duration of such a house, and the confidence that is felt in the integrity of its management. The integrity or ability, however, of those who have founded such a house, does not appear to have been regarded as the sole source of the value of its name, inasmuch as the right of those who have succeeded to the interest in it to continue it under the same name has been recognised; and this would apply, not merely to banking houses, but to any mercantile business; and also, under certain circumstances, to manufactories, especially to those where the article is manufactured by machinery, as is now extensively the case, the mode of manufacture being a mere matter of detail, which may be conducted as well by those who succeed to the interest as by those who first established the manufactory.

. In the present case, the business carried on by Hegeman & Co. involved both trading and manufacturing. They were the successors of a business originally established in this city in 1827 by William L. Rushton, who associated with him, in 1832, James S. Aspinwall, for the sale by wholesale and retail of drugs and medicines, with which was connected the putting up of medical prescriptions, and of special preparations known by names of their own creation or adoption. Rushton and his successors were pharmaceutists as well as druggists, by which I under-

stand those who prepare or compound medicines and also deal in drugs. William Hegeman was originally in Rushton's employment. In 1843 he became the partner in place of Aspinwall, and continued thereafter during several changes of proprietorship and of the name of the firm, until he became the principal proprietor in the last firm and name which it assumed, and which he gave to it, of Hegeman & Co., having then a central or principal place of business at 203 Broadway, with branches in other parts of the city. I have not the evidence now before me, but my recollection of it is, that the business, as conducted by him and his son, J. Niven Hegeman, who constituted the company, had a high reputation, which was largely due to his experience, knowledge and business qualities, and that it stood as high as any house in the same business in this city. It appears that the special preparations before referred to were made up from formulas or recipes, and were distinguished by special names, with which that of Hegeman was incorporated, —such as " Hegeman's Compound Fluid Extract of Buchu,"— and by a symbol or emblematic trade-mark which represented the figure of an eagle, with extended wings, perched upon a mortar and pestle, with a scroll from the eagle's mouth containing the words, " Established 1827," which was accompanied by a statement on the label that the article was prepared, or prepared only, by Hegeman & Co. A business like this, which had been long established for the putting up of medical prescriptions, the making and vending of special preparations from formulas and recipes, and the buying and selling of drugs, and of such other articles as are connected with such a business, the proprietors of which had been several times changed, as well as the name or title of the firm, could be continued, as it had been before, by successors acquainted with such a business, who would attend to its details ; and I would not be warranted in holding that the value of the business name or good will depended solely upon the personal qualities of the elder Hegeman, and would cease altogether upon his death. The personal qualities of those who establish a business, or who, for some years, have

carried on one that was previously established, may or may not have an effect upon the value of the good will and business name.    Persons go to a particular place of business for various reasons ; some because they do, or think they do, get what they want better and cheaper than elsewhere, or because the house has a special commodity, procurable there only, or a greater variety of some particular article ; some, simply because they have been in the habit of going there ; others, because they are known to the attendants, and being recognised as customers will, or expect to be, better served ; others, because they are directed or recommended to go by those who are in the habit of dealing there, or because the locality is convenient, or for other reasons.    Many purchase for years at large houses in this city, like A. T. Stewart & Co., or R. H. Macy & Co., who never see the proprietors and are never seen by them.    The existence of the same business in the same place for many years may constitute the chief value of the good will, independent of who are the proprietors, and continue under many changes of proprietors.    A business once thoroughly established, and having a large custom, may go on thereafter mechanically, so to speak, by a careful supervision and attention to its details, and be conducted by those who succeed to it as satisfactorily and as successfully as by those who founded it.

The long duration of a business, like the one in the present case, which, at the death of the elder Hegeman, had been in existence in this city for nearly half a century, had necessarily an effect upon the value of the good will, as in the progress of years such a business would become more widely known, the business name and address being put upon every bottle and package ; and where advertisements would be largely resorted to, and continued for years to call attention to what was an important part of it—the sale of special medical remedies, or, as they are more generally called, patent medicines, from the assumption that the mode of their preparation is known only to the proprietor.    Hegeman succeeded to predecessors who may have had much to do with establishing the reputation which the house had

acquired, and in like manner others succeeding to him may maintain what he continued or augmented; for Marcher, one of the successors under the sale by the assignee, had been for twenty years in Hegeman's employment, as Hegeman, before he became a proprietor, had been sixteen years in the employment of William L. Rushton, and Rushton & Aspinwall. Hegeman's skill and experience as a pharmaceutist was no doubt important in the business; but in respect to the business generally, it is to be noted that while he and his son were proprietors the financial condition of it became impaired. The branches were lopped off, and my recollection of the evidence is, that at the time of his death the main business was seriously embarrassed financially; but whether this was so or not, the house became insolvent two years afterwards. After William Hegeman's death the sole value of the good will certainly did not depend upon the personal qualities or supervision of his son and successor, who, when in partnership with his father, had no diploma from the College of Pharmacy; nor skill nor experience in compounding medical preparations, but attended to other branches of the business. In the pharmaceutical department several persons were employed, who made up the special preparations from the formulas or recipes which the elder Hegeman gave them, copied out from a book which he kept in his possession. Upon his death, the son, as the surviving partner, carried on the business in his own interest and that of those to whom the interest which his father possessed had passed by his will, and the business having been either embarrassed at the time of the elder Hegeman's death, or becoming so under the management of the son, the firm became insolvent, and the son, J. Niven Hegeman, as the surviving partner, made a general assignment for the benefit of creditors, conveying to the assignee the entire copartnership property and effects in the most general and comprehensive terms, such as "all choses in action," and "all property and effects, of every nature and description, of whatever name and nature." And the assignee, on the 11th of March, 1878, under this assignment, after having sold out a certain

portion of the stock, sold to Mrs. Gertrude A. Cutter the residue, with the trade-mark, the good will, and, as connected with it, the business name, and "all preparations, recipes, formulas, prescriptions and recipe-books, labels, plates, proprietary rights, and proprietary articles." This sale was made for the sum of $8,000—$2,000 being the estimated value of the stock, which may or may not have been of greater value, the evidence upon that point being conflicting, and $6,000 for the good will, business name, trade-mark, recipes, &c. Whatever may have been the actual value of the stock, it is very clear that in this sum of $8,000 considerable value was attached, both by the assignee and the purchaser, to the value of the business name, good will, locality, trade-mark, &c.; and this $8,000 went to the payment of the creditors of the insolvent firm.

On the same day that this sale was made to Mrs. Cutter, G. B. Marcher, who, as I have said, for twenty years had been employed by the firm of Hegeman & Co., and who, during ten years of that time, had, under William Hegeman, the supervision of the compounding and putting up of the special preparations, or what are called in the papers the proprietary articles, entered into an agreement with the widow of William Hegeman, and three of his children, to whom he had left by his will all the residue of his property, by which agreement with Marcher, whatever rights they had to manufacture and vend Hegeman's preparations or proprietary articles, or to his trade-marks, or labels, or right to use the name of Hegeman, or of Hegeman & Co., was transferred to Marcher, upon the consideration that he would make and vend them as licensee, under the name of Hegeman, or Hegeman & Co., and pay a royalty of one-fourth of the net profits arising from their sale to the widow, Mrs. E. G. Hegeman; and on the same day Marcher, together with William A. O. Hegeman, one of the sons of the elder Hegeman, and H. T. Cutter, the husband of Mrs. Cutter, formed a corporation under the act of 1848, authorizing the formamation of corporations for manufacturing, mining, and chemical purposes, declaring in the certificate filed by them that

the name of the corporation was Hegeman & Co.; that it was formed to compound, manufacture and sell drugs, and to carry on a general drug business and everything incident thereto, and also to prepare and keep for sale the preparations and proprietary articles lately dealt in by the firm of Hegeman & Co., and known as Hegeman's or Hegeman & Co.'s preparations. And on the 15th day of March, 1878, Mrs. Cutter assigned to the corporation all the interests that she had acquired by the purchase and assignment from the assignee; and on the 23d day of October, 1878, Marcher conveyed to the corporation all the interests that he had acquired under the assignment from the widow and three children, subject to the performance of the conditions contained in it.

On the 12th day of March, 1878, the day after the execution of the certificate of incorporation, a circular was sent, under the name of Hegeman & Co., to the customers of the firm, announcing that it gave them (Hegeman & Co.) pleasure to inform the recipients of the circular that the concern of Hegeman & Co. had resumed business on the 11th of March, 1878, the residue of the circular being as follows : " Mr. George B. Marcher, for twenty years in charge of *our* wholesale business and manufacturing department, has become associated with *us*, and under his personal supervision, *we* confidently assure our patrons of every attention as heretofore. Thanking our friends for any past favors, and soliciting their patronage for the future, we remain yours very truly, Hegeman & Co."

On the 14th of March following, the certificate of incorporation was filed, and the corporation have since, and are now, continuing the business as a corporation, styling themselves upon their labels, cards, advertisements, &c.,—without any reference to their corporate character or derivative title,—" Hegeman & Co., chemists and druggists, 203 Broadway only, New York."

In October, 1878, J. Niven Hegeman, in a letter addressed to Marcher, informed him that he did not recognise his right to carry on the firm as he was doing; and in the

following January, 1879, he associated himself with J. W. Ferrier, who had been an employee of the old firm of Hegeman & Co., and who was then employed as a clerk by the corporation, and they, J. Niven Hegeman and Ferrier, under the old title of Hegeman & Co., began business in a store, 756 Broadway, which had formerly been one of the branch stores of the old firm, and which had been sold during the lifetime of the elder Hegeman to a person who carried it on in his own name and with the title of "Successor to Hegeman & Co.," and which was subsequently sold, under a sheriff's sale, and purchased by the judgment creditor, who carried it on for a short time thereafter. In the business thus established by J. Niven Hegeman and his partner, Ferrier, they claimed to be a continuation of the old firm of Hegeman & Co., and assumed the right to manufacture and vend all the proprietary articles of the old firm, and the right to use the trade-mark, labels, and everything pertaining to it, and are so doing, having upon the proprietary articles a label printed in all respects like that used by the corporation, with the exception that the name of the place of business is 756 Broadway, and that the word "only" is omitted.

In the two actions brought, the relief asked for is substantially of the same character, each asking that the other be enjoined from using the name of Hegeman & Co., or the trade-mark, labels, or other indicia of that firm—which is substantially a statement of all the material facts that I have to pass upon.

It is very clear to my mind, as I have already stated, that all the interests, of whatever nature or kind, including the good will, business name, trade-mark, &c., passed to Mrs. Cutter, the purchaser under the sale by the assignee, and is vested in those to whom she subsequently conveyed all she purchased ; and that J. Niven Hegeman has no right growing out of his former connection with the partnership to assume or hold out to the public, and to the detriment of those who acquired by purchase all that remained of the former firm, that he is carrying on the same firm and busi-

ness; or to vend the special preparations of that firm, so labelled and marked as to indicate to purchasers that they were put up and prepared by that firm; that he has no right to the business name, the trade-mark, or to anything incident or belonging to the firm, except the use of his own name, of which he cannot be divested, and the right to attach his own name to the articles he manufactures and vends; but not in such a way as to pass them off as the articles manufactured or prepared by the firm of Hegeman & Co., or by those who have succeeded to that firm, and also the right to enjoy whatever benefit or advantage he may derive by representing that the business carried on at 756 Broadway is carried on by a firm, one of the partners of which was formerly a member of the firm of Hegeman & Co. This, in my judgment, is all the rights he now possesses through his former connection with the insolvent firm, the assets, proprietary rights and interests in which have passed to others.

It now remains to determine whether those who purchased all the effects, business rights or advantages and interests of the insolvent firm are entitled to carry on the business in the manner they have done and are now doing, and in respect to that, my judgment is equally clear. All that could be obtained by the purchase from the assignee was the right to succeed to whatever the insolvent firm possessed, which gave the purchaser, or those to whom she subsequently transferred her interest, no right to represent to the public, as they have done and are still doing, that the former business, which was temporarily suspended, has been resumed by the same persons, having associated with them G. B. Marcher. They are not, nor are any of them, the same persons who carried on the previous firm. They have acquired no right, and could acquire none, to the business or anything connected with, or incident to it, from the widow or children who made the assignment to Marcher, for they had nothing to transfer, everything belonging or appertaining to that firm having passed under the assignee's sale to Mrs. Cutter; and whatever interest those who are

now conducting the business as a corporation have, is what she transferred to them, or to it, by assignment. She and they, as her successors in interest, had a right to all the advantages of the business name, as much so as to the locality and the good will, of which the business name is but a part.

There is a certain value in the business name, and they, and they alone, are entitled to the advantages of it, whatever those advantages may be. As they are carrying on the same business in the same place, the business name and the locality, as I have said, enter into, and are parts of, what in such a case constitute the good will. (*Howard* v. *Henriques*, 3 Sandf. 725.) " This," Lord Eldon said, " is the probability that the old customers will resort to the old place" (*Cruttwell* v. *Lye*, 17 Ves. 346) ; and " *the name of a firm*," in the language of Vice-Chancellor Wood in *Clinton* v. *Douglass* (1 H. R. V. Johns. 176), " is a very important part of the good will of the business carried on by the firm."

What they have acquired is not the right to represent themselves to the public as the former firm, but as the successors of Hegeman & Co. (*Hall* v. *Barrows*, 10 Jurist, [N. S.] 55), which gives them all the advantages of the business name which they could acquire, and is a truthful represen tation to the public of what they actually are. " If," it was said in the case last cited, which was a bankruptcy case, " the court direct the sale of the business or the manufacture carried on by the owner of the name, it might give to the purchaser the right to represent himself as the successor in business, and, *in that manner*, to use the name." Those, says Troplong, who succeed to a deceased merchant's business are forbid, by the commercial Code, art. 21, (France), from continuing it in his name (which article provides that the names of the copartners constituting the firm can alone be represented in the name of the firm—*Les noms des associés peuvent seuls faire partie de la raison sociale*). Credit, he says, is altogether personal. It is not transmissible. It is won by actions and capacity. It is not right, then, that a successor should avail himself of a fallacious credit, in appropriating a firm's name extinguished by the death of one of

those who gave to it its value; and he expresses his astonishment that the right to do so should be recognised in England, as it is a fraud upon a confiding public.—*Troplong. Le droit civil*, tom. xii. p. 372.

In *Bautain* v. *Merkline* (Annales de la Prop. tom. iii. p. 307), Bautain and wife had sold to Merkline and wife an establishment where they had carried on the business of opticians, and it was stipulated that the purchasers, as successors, might avail themselves of the name of Bautain, if convenient. They used the name, however, on their sign, cards, &c., without any reference to their being successors, and it was held that they were not entitled to do so; that they could use it only by expressing with it that they were successors. These are French authorities, but we are not without authority to the same effect in this country. In *Sherwood* v. *Andrews* (5 Am. L. Rep. [N. S.] 588), it was held, that every assignee or purchaser who uses the trademark of the original proprietor without indicating that he is the assignee or purchaser, practises an imposition upon the public. " I do not deny," says Chief Justice Wilson in delivering the opinion of the court, " that the right to use the trade-mark of the original proprietor passes with the good will, by operation of law, to the executor and to the assignee of a bankrupt; and that it may pass to an assignee by express agreement between the parties; but I insist that in such cases, in order to receive the aid of a court of equity, the parties must add to the original trade-mark words indicating the authority for, and the right to its use as executor, assignee or successor of the original proprietor, as the case may be. Assignees of trade-marks have no special privilege of sailing under false colors, and if they will persist in doing so, prudence would dictate that they give courts of equity a wide birth."

It is declared by statute to be a misdemeanor in this State for any person to transact business in the name of a partner not interested in his firm; and that, where the designation "and Company" or " & Co." is used, that it shall represent an actual partner or partners (L. 1833, c. 281, p.

404) ; and by the act of 1854 (L. 1854, c. 400, p. 1084) the use of a copartnership name, theretofore or thereafter used by firms having business relations with foreign countries, where the business is continued by some of the copartners, or by assignees or appointees, may be continued, provided that, on every change of the persons continuing the use of the name, a certificate shall be filed and notice published in the mode directed by the statute. These statutory enactments prevent, in this State, the continuance, after the death or retirement of partners, of the name of firms as they have been and are probably still continued in England, and were, in this State, before the passage of these statutes.

It is not assumed that any right to continue the name of Hegeman & Co. has been derived under, or by a compliance with, these statutory provisions. The successors in interest, however, have sought to accomplish the same thing, by filing a certificate to incorporate themselves as a manufacturing company, under the general statute, by the name of Hegeman & Co., devised as a means of enabling them, under the forms of law, to hold themselves out to the public as being the firm of Hegeman & Co., instead of being, as they are, the successors of that firm—a device which, however ingenious, will not accomplish the purpose sought to be effected ; at least, so far as securing for them the protection of a court of equity in the use of the name in that way. It is an attempt to do, by means of a formal incorporation under the general statute, what is forbidden by law and declared to be a misdemeanor—that is, to transact business in the name of a person not interested in the firm. It is, in fact, trying to do by the instrumentality of one statute what they are forbidden to do by another. The fact that W. A. Ogden Hegeman, who is a practising lawyer, was associated as one of the copartners does not make the case any better, as he never was a member of the firm of Hegeman & Co., and the futility of attempts to get the benefit of a business name, by contrivances of this kind, has been declared in adjudged cases (*Croft* v. *Day*, 7 Beav. 84 ; *Bloss* v. *Bloomer*, 23 Barb. 604; Brown on Trade-marks, §§ 374, 393, 423). I

do not mean to say that Marcher, Cutter and W. A. Ogden Hegeman could not have associated themselves together in good faith, in the same kind of business, under the copartnership name of Hegeman & Co.; or that J. Niven Hege man and Ferrier might not have done the same; which would have been forming a new business with the same name as the former one. But this was what neither undertook to do, or are doing. J. Niven Hegeman and Ferrier claim to be carrying on the old firm, using its trade-mark, its name, and selling its proprietary articles with substantially the same kind of label, as if it were still in existence, and those who have succeeded to its interests are doing exactly the same, having notified the customers that the firm had resumed business, having associated with it G. B. Marcher, and are assuming to carry it on, so far as respects the public, as if that were the only change that had been made.

My conclusion in this case is, that neither of the parties plaintiff in these cross-actions have, upon the facts before me, established any right to the equitable aid of the court. That those who have acquired through the sale under the assignee, and by subsequent conveyances, all that remained of the assets, interests, rights or property of the insolvent firm of Hegeman & Co., have the right to use that business name, and the trade-mark with it, if they so use it as to express the fact that they are successors to, and not the original firm. That if they abandon their present mode of styling themselves "Hegeman & Co.," and upon their signs, labels, stamps, advertisements, &c., &c., declare themselves to be, what they really are, *successors* to Hegeman & Co., they will be entitled to the equitable aid of the court to restrain J. Niven Hegeman and Ferrier from holding out to the public that the business they are carrying on is a continuation of that of the old firm, and of making use of its trademark, business name, &c., to the detriment of those who have acquired whatever interest there is in the trade-mark and name. That, so far as I can judge from the specimens exhibited on the trial, the articles, called proprietary articles,

have all names indicating the qualities, ingredients, or composition of the articles ; such as *"Hegeman's Ferrated Elixir of Bark, or Elixir of Calisaya Bark with Iron," "Hegeman's Compound Fluid Extract of Buchu," "Hegeman's, formerly Velpeau's, Celebrated Remedy for Diarrœha,"* and that no trade-mark exists in these names. (*Caswell* v. *Davis*, 58 N. Y. 223 ; *Ayer* v. *Rushton*, 7 Daly, 9.) That so far as J. Niven Hegeman and Ferrier attempt to sell articles by such names, and put them up in such a way, as to deceive purchasers in the belief that they are made and put up by the successors of Hegeman & Co., or by that firm as if it were still in existence, they will be restrained upon the application of those who have succeeded to the interests of that firm when they are in a position to call upon a court of equity to protect them.