### PRINCE MANUF'G CO. *v.* PRINCE'S METALLIC PAINT CO.

*(Supreme Court, Special Term, New York County. January, 1890.)*

1. TRADE-MARKS—MORTGAGE FORECLOSURE—RIGHTS OF PURCHASER.
    The purchase at foreclosure of mills and mines where a certain kind of paint, known by trade-mark as "Prince's Metallic Paint," had been originally manufactured, does not carry with it the right to use said trade-mark, or affect the right of the former manufacturers to use same, particularly where it had already been used by them to designate the product of other than the original mills, and so had ceased to indicate primary origin or locality.

2. SAME—EXECUTION SALE.
    A trade-mark cannot be levied on and sold under execution, as a species of tangible property, apart from the article it has served to identify, unless under authority of statute.

3. SAME—TRANSFER.
    A transfer to a director of the trade-mark of a corporation, not, however, at a regularly called meeting, but when only he and one or two other directors are present, and without notice to a third, is invalid.

4. SAME—ASSIGNMENT.
    An assignment of the trade-mark of a corporation, made by the president, in connection with the good will, but without any showing of authority, is invalid.

Action by the Prince Manufacturing Company against Prince's Metallic Paint Company. Judgment for defendant.

The decision herein was reversed by the general term, (15 N. Y. Supp. 249,) but on appeal to the court of appeals the decision of the general term was reversed, and the decision of the special term was affirmed. See 31 N. E. Rep. 990.

*Frederick R. Coudert* and *John S. Davenport,* for plaintiff. *Joseph H. Choate* and *John Frankenheimer,* for defendant.

PATTERSON, J. This action is based altogether upon what is claimed to be an infringement of a right to a trade-mark. That is the only cause of

action set forth in the complaint. Everything there charged against the defendant is in connection with the violation of that asserted right. There is no claim for relief founded upon a cause of action arising from fraudulent conduct of the defendant, separated from the alleged infringement of a trade-mark. I am therefore compelled to treat the cause as one resting upon the single cause of action stated. *Fisher* v. *Rankin*, (Sup.) 7 N. Y. Supp. 837, and cases there cited. If the complaint contained a cause of action dissociated from the claim of an absolute exclusive ownership of a trade-mark, the case would have presented an additional question to that which is now to be considered; but, as the pleadings stand, I am at liberty to treat it only as a simple trade-mark case.

The contest is between two foreign corporations, both created and organized under the laws of Pennsylvania. Each claims the right to the exclusive use of the words "Prince's Metallic Paint," as applied to the article of merchandise manufactured or sold by it. There is no such resemblance in the corporate name or designation of the respective parties as would itself lead to mistake or confusion in the minds of purchasers of the product of either party, or operate as a deception upon the public. The plaintiff's designation is the "Prince Manufacturing Company," the defendant's, "Prince's Metallic Paint Company;" but the plaintiff contends that it has acquired the right and is entitled to the exclusive use of the words "Prince's Metallic Paint" as a trade-mark for its goods, and that the defendant has illegitimately, and for the sole purpose of depredating upon and taking away the plaintiff's business, adopted a corporate title almost identical with the plaintiff's trade-mark. The use of that corporate title as an invasion of the trade-mark claimed by the plaintiff is sought to be enjoined in this action. Although the names of the two corporations are materially different, yet, if the plaintiff has the right to the exclusive use of a trade-mark, whether it consists of a corporate name or of some arbitrary designation coming within the allowance of the trade-mark law, and its product has become known under that trade-mark, and the defendant, under cover of its name, does or might, by imitating that trade-mark, divert the plaintiff's business to itself, the plaintiff would be entitled to enjoin the violation of that right. *Goodyear Rubber Co.* v. *Goodyear Rubber Manuf'g Co.*, Price & S. Amer. Trade-Mark Cas. 922.

The contention of the defendant that it is entitled to use its corporate name, it having organized under a statute of the state of Pennsylvania, which authorizes a purchaser, under certain circumstances, to acquire the franchise of a prior existing corporation of the same name, and which was sold pursuant to that act, does not stand in the way of the plaintiff's right to relief, provided the plaintiff has shown, on the facts of the case, a clear, exclusive right to the use of the trade-mark it claims. I do not consider it necessary, in this aspect of the case, to refer to the subject of the legality, under the laws of Pennsylvania, of the assumption by the parties who organized the defendant corporation of its corporate name. It cannot wrongfully acquire whatever of advantage or prestige the plaintiff may have obtained by reason of its use of a particular designation for its goods, if it clearly appears that such plaintiff is entitled to the exclusive use of that designation. It is entirely immaterial in what form or under what guise the illegitimate or fraudulent appropriation by the defendant of that trade-mark or name may have been made. What the court is to look at is the protection of a substantial right, and whether it is invaded by an individual, or by an artificial body called a "corporation," can make no difference. Exclusive right, which involves priority of use, or a clear title to the trade-mark, derived from some one competent to give it, or by operation of law, is sufficient to protect against an infringer.

This leads us to the consideration of the plaintiff's claim to the exclusive right to the use of the words "Prince's Metallic Paint," and it is manifest at

the outset that the plaintiff corporation, having been organized in the year 1879, cannot have any original right to that exclusive use as a corporation; for it is admitted that nearly a quarter of a century before those words were used as descriptive of the origin or ownership of manufactured goods of Antoinette Prince and Robert Prince, her husband, and that in the mean time the right to the use of these words as a trade-mark, or as associated with the manufactured goods of other parties, actually did belong to such other parties. The plaintiff must therefore trace its right and title by assignment from some one competent to pass to it the ownership of the trade-mark in conjunction with the goods it manufactured, or by some legal devolution of title; for it is not disputed that a trade-mark is not such a species of property as will pass in gross without being connected with the right or the ability to produce the goods covered by it, in the case of a manufactured article, as distinguished from a natural product; nor is it suggested that the trade-mark could not be acquired by assignment. The practical question is: Have all intermediate rights between the original proprietors of the trade-mark and the present plaintiff been extinguished, and have they all vested in the plaintiff? As said before, the plaintiff's right, if any exists in this action, must be derivative, and not original. It cannot be original in the corporation plaintiff, because it existed in others prior to the organization of the plaintiff. It is argued with some earnestness that the children of Antoinette and Robert Prince had the right to give to the plaintiff corporation their own name, and to use that name upon the product of their mills or mines, and this possibly may be so; but at the same time when this plaintiff corporation became organized there was another corporation in existence, the predecessor of the defendant, which had, on the plaintiff's own showing, the undoubted right to use the trade-mark, not by license, but by ownership. It becomes necessary, therefore, to consider the testimony and documentary evidence respecting the plaintiff's claim to the exclusive use of this trade-mark as derived from the original owners, Antoinette and Robert Prince. The burden of proof is upon the plaintiff to show its chain of title or succession, and this involves the obligation on its part to show by clear and satisfactory evidence that it has acquired that trade-mark. It has attempted to do so, but, as I think, unsuccessfully. Its position is this: That it has the ability to manufacture the article to which the trade-mark was from the first attached, namely, to manufacture that which was known as "Prince's Metallic Paint" in and subsequent to the year 1858; that it has acquired an absolute ownership of the trade-mark; and that, being the manufacturer of the original product, and having the trade-mark, it is entitled to the protection of the court. On this topic reference is required to the history of the manufacture of this article of merchandise, and a consideration of the character and effect of the instruments by and through which the plaintiff claims the right to the exclusive use of the trade-mark to belong to it. The history of the manufacture of the article called "Prince's Metallic Paint," and of the right to those words as a trade-mark, may be briefly stated. About the year 1858, Antoinette Prince owned 42 acres of land in Carbon county, Pa., upon which was found a certain iron ore of special value as a basis for the manufacture of paint, and she and her husband began such manufacture at a certain mill, and gave to the product of that mill the designation of "Prince's Metallic Paint." On the death of Mrs. Prince, her executor carried on the business, and, in 1860, sold a half interest in the mill and mine to one Brick. A few years later Bass, who was a son-in-law of Robert and Antoinette Prince, was admitted to an interest in the business, and he purchased Brick's undivided half of the real property, and became a joint proprietor in the business. In 1871 (Robert Prince having in the mean time died) David Prince, as executor and as an individual, and Bass and his wife, formed a copartnership for the manufacture of Prince's metallic paint, and the trade-mark in

question was used by that firm.    Later in that year Bass purchased the interest of the estate, and also David Prince's interest in the business, and acquired the ownership of the mill, the mine, the good will of the business, the trade-mark, and certain personal property.    Bass and other parties carried on the business and used the trade-mark until 1873, when it was attempted to create a corporation under the name of Prince's Metallic Paint Company, under which name the business was thenceforward carried on; but there were informalities in the proceedings, and that corporation was not formally created until 1875.    In the interval the trade-mark was used in the business by Bass and others in the unincorporated association.    On the complete organization of the corporation in 1875 all the property, real and personal, of the business was transferred to it, and it used the trade-mark which had been registered by the unincorporated company in 1873.    In 1875 a new mill was built by the corporation, upon which a mortgage was given to one Neidlinger.    There were also mortgages then existing on the original Prince mine.    There was one by Albert Bass to Seaton Heather of one half interest.    This mortgage was afterwards foreclosed, and the premises were sold and conveyed to Heather, by the sheriff of Carbon county, by deed dated June 17, 1879.    Another mortgage was that of Bass to David Prince, executor, conveying the half interest in the property, including the original mill and mine.    This mortgage was afterwards foreclosed, and the premises sold to Henry Lovejoy, and conveyed by the sheriff to him in October, 1878.    The property upon which the new mill was built, and which had been bought by the Prince's Metallic Paint Company from the Lehigh Navigation Company, was mortgaged in January, 1877, to Neidlinger, as above mentioned.    That mortgage was foreclosed in 1878, and the premises were conveyed by the sheriff to Balliet and Meendsen in October, 1878.    In December, 1878, Balliet and Meendsen conveyed to Sadie Fenick Prince and Lizzie F. Prince the same premises which had been conveyed by the sheriff, and the last-named persons subsequently conveyed to Henry Lovejoy the same premises; and he, in May, 1879, conveyed to the Prince's Manufacturing Company (the plaintiff) all the property which had been conveyed to him by the sheriff and by Sadie and Lizzie Prince.    It does not appear that the plaintiff had any continuous right to the half owned by Seaton Heather until July 30, 1888, when a lease was given of an exclusive right to mine, but it seems that in 1883 Heather and the Prince's Manufacturing Company conveyed the site of the original mill, or the original mill property, to one Buck.

I assume, for the purposes of this case, that the Prince Manufacturing Company did have and has possession of mines from which and a mill at which metallic paint similar to what was called "Prince's Metallic Paint" could be and is manufactured, but I am not prepared to hold that such possession gives to the plaintiff corporation an exclusive right to the use of the trade-mark which the Prince's Metallic Paint Company had, before the organization of the plaintiff corporation, an undoubted authority to use.    The acquisition of the mill and the mines under the foreclosures and through conveyances from the purchasers at the foreclosure sales was of nothing but the property sold.    Those sales did not extinguish the corporation, nor destroy its capacity to do business, nor transfer its good will, nor take away from it the right to use its trade-mark upon paint should it acquire other mines and erect a new mill and resume the business of manufacturing paint, which it still had the franchise to do, and using its corporate name in connection with its product, for it is not to be doubted that the trade-mark "Prince's Metallic Paint" had ceased to indicate the primary origin and ownership of the product, or the locality at which it was produced.    That trade-mark had been used at a different mill, one at which paint had been manufactured from ore which had been extracted from another mine than that of the original Prince 44 acres.    The case is therefore different from those cited by the counsel for

the plaintiff in support of their proposition that the ownership of the property and their ability and right to produce the article carried with them the trade-mark. This trade-mark had ceased to designate the product to which it had originally been attached, as indicating locality or origin; but, whether that be so or not, as the purchasers acquired this real property simply under sales on foreclosure of mortgages, without thereby extinguishing or acquiring the right of the Prince's Metallic Paint Company to use the trade-mark, it cannot be said that, because of their obtaining the legal title to the real estate, they stand in the position of transferees or purchasers of the trade-mark or designation. In other words, I do not think that, simply by buying at a foreclosure sale what is called the "new mill," and an interest in the land from which the ore was extracted, the plaintiff bought such a right in connection with the manufacturing of paint as would entitle it to the exclusive use of a trade-mark which certainly did belong to the owner of the property, whose mere title to the realty was extinguished and transferred by the foreclosure sale.

But the plaintiff claims title to the trade-mark by assignment, and contends that this right is derived from certain sources, three of which only require notice. Its claim in this relation is best stated in the words of counsel: "(1) That [the title] of a man named Meendsen, who had acquired his claim by a levy on execution while he owned the mill; (2) by a conveyance from A. R. Bass claimed it as already conveyed to him by the Prince's Metallic Paint Company; (3) by relinquishment of the old Prince's Metallic Paint Company of any claim they had." The facts respecting the sale to Meendsen appear to be that on the 23d day of November, 1878, the sheriff of Carbon county sold under a common-law execution to Meendsen this trade-mark *eo nomine*, and nothing else, and that Meendsen assigned it subsequently to the plaintiff. The claim may be disposed of upon the ground that a trade-mark is not a thing that could be levied upon and sold under execution as a species of tangible property, unless under the authority of a local statute authorizing such a sale. A trade-mark cannot be assigned in gross, nor can it be used, except in connection with the manufacture or sale of the article it has served to identify. The proprietor could not transfer it to a third party for general use by him, (*Samuel* v. *Berger*, 24 Barb. 163,) as that would enable such third party to deceive the public. If a title could not be given on a sale of the trade-mark by the proprietor thereof except in connection with his business, I fail to see how such a title could be transferred by proceedings taken against him to collect a debt, or upon a simple *fi. fa.* on a judgment in an ordinary common-law action. That the title would pass through bankruptcy proceedings, or on an assignment for benefit of creditors in connection with the sale of the bankrupt's or assignor's business, is true, but in such case it is equivalent to an assignment of the business and good will by the bankrupt or assignor himself. *Hudson* v. *Osborne*, 39 Law J. Ch. 79. It may be stated as a general principle that the trade-mark cannot be severed from the good will. *Leather Cloth Co.'s Case*, 4 De Gex, J. & S. 137. While the property right may pass by assignment or by operation of law, it must be to one who takes at the same time the right to manufacture or sell the particular merchandise to which the trade-mark has been attached. *Crucible Co.* v. *Guggenheim*, 2 Brewst. 321. And to the same effect, *Congress & Empire Spring Co.* v. *High Rock Congress Spring Co.*, 45 N. Y., at page 302. See; also, *Hegeman* v. *Hegeman*, 8 Daly, 1. It cannot be claimed that the purchaser at the execution sale bought the good will of the Prince's Metallic Paint Company, for he did not buy the business of that company. All that was sold, according to the return or certificate of the sheriff, was the trade-mark. That trade-mark name is an important part of the good will, but not all of it. The "custom," as it is called, of the corporation,—the possibility that those dealing with the corporation would continue to do so,—was another part of it. I do

not think this is limited merely to the good will of a going concern, in this view of the case. "The neglect to carry on the business for a number of years does not prevent a party from resuming his trade-mark, or sign of the good will, nor entitle another to use it." *Manufacturing Co.* v. *Hall*, 61 N. Y. 234, and cases there cited. Meendsen did not acquire that good will of the business, and did not engage in the manufacture or sale of Prince's metallic paint, and, unless the shadow can be separated from the substance, and be bought and sold and traded in, he got nothing by his purchase, and had nothing to assign or transfer to the plaintiff, and it acquired nothing from him. *Woolen System Co.* v. *Le Boutillier*, 47 Hun, 521. Nor does the Pennsylvania statute aid the plaintiff. The statute is not to be construed as authorizing any one to purchase a trade-mark, and affix it to his own product, for that would be a construction which would permit of a fraud or deception being perpetrated upon the public.

The plaintiff claims title through another source, and from one to whom not only the trade-mark, but also the business, of the Prince's Metallic Paint Company was transferred. It appears that A. R. Bass, a director or trustee of the corporation named, procured to be made to him what purports to be an assignment of the trade-mark by the Prince's Metallic Paint Company. This paper is dated September 16, 1878, and is executed by A. R. Bass, president, the official transferring the trade-mark to himself as an individual. The question arising here is as to the sufficiency of this assignment as a corporate act, (independent of other matters affecting it.) That this trade-mark belonged to the corporation seems to be clear, and there is a resolution on the minute book which ostensibly authorizes the transfer, but that resolution was passed at a meeting at which only two or three directors of the company were present,—the one, Heather, and the other, Bass. Seltzer, the third director, was never notified of the meeting, was not present, and never heard of the assignment until it was spoken of on this trial. It is clear that the whole transaction was carried through by Bass and Heather; and Bass, the assignee, procured the assignment by his own act and his own vote, and without that could not have assigned it. The resolution by which it is said this authority to transfer this trade-mark is given is of the most sweeping character. All the property, personal and real, of the company, is sold to Bass. Seemingly everything that belonged to the stockholders of the corporation was to be passed over, pursuant to the terms of the resolution. It cannot be doubted that such resolution would be held void as to the corporation, its stockholders or creditors, if they attacked it. Bass could not have enforced it against the company. *Gardner* v. *Ogden*, 22 N. Y. 327; *Butts* v. *Wood*, 37 N. Y. 317: *Munson* v. *Railroad Co.*, 103 N. Y. 58, 8 N. E. Rep. 355; *Hoyle* v. *Railroad Co.*, 54 N. Y. 314. The defendant claims to stand in the position of the creditors, under a statute of Pennsylvania, and hence asserts the right to disaffirm and repudiate this transfer, but it is not necessary in this case to determine its *status* under this statute. It is sufficient that the resolution was not passed at a regularly called or authorized meeting of the Prince's Metallic Paint Company, and that there was never a sufficient corporate act to give title to Bass. That resolution, although it appears on the minutes to have been adopted, was utterly ineffectual. There never was a meeting of the directors in a legal sense. Mor. Priv. Corp. § 531. It was simply the act of two directors meeting, and, without the knowledge of their codirector, undertaking to dispose of the whole corporate property.

Nor did the plaintiff acquire title to the trade-mark from the Prince's Metallic Paint Company under the agreement of January 8, 1880, purporting to be made between A. R. Bass, the Prince's Metallic Paint Company, and Mary M. Bass, wife of A. R. Bass, and the Prince Manufacturing Company, (the plaintiff.) By that agreement the three parties first named transfer and set over to the plaintiff, among other things, all right, title, and interest in any

trade-marks, labels, or brands for paint in which they, or either of them, have any interest, particularly the trade-mark "Prince's Metallic Paint," etc., and all right to use the name of Prince to describe paint, etc., and also the good will of any and all paint business in which they or either of them have any interest, etc., in consideration of which the plaintiff agrees to pay, during a certain period, a stated amount to Mary M. Bass or her personal representatives. This agreement is signed by Bass, as president of the Prince's Metallic Paint Company, but there is nothing whatever to show authority given by the company to Bass to transfer the trade-mark and the good-will. It seems as if this paper had been drawn especially to meet the objection that the trade-mark could not be assigned except in connection with the good will, but, in the absence of any authority to Bass to make such a conveyance or transfer, his act was not sufficient to deprive the corporation of its property or to pass a title. The agreement cannot be supported on any ground. There was no consideration to be paid to the Prince's Metallic Paint Company, but only to Bass' wife. The agreement does not affect the question in the view I take of it, and I cannot find in the evidence any ratification, binding the corporation or stockholders, of the act of Bass, as president, in disposing of the trade-mark and good will. It is unnecessary to refer at length to other questions discussed on the trial. There must be a judgment for the defendant dismissing the complaint on the merits, with costs.